**Jeremy L. PETERS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 43A05–1103–CR–144.

Court of Appeals of Indiana.

Dec. 30, 2011.

Donald R. Shuler, Barkes, Kolbus & Rife, LLP, Goshen, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Jeremy Peters appeals his conviction of Class B felony unlawful possession of a firearm by a serious violent felon ("SVF").[1] He raises three issues for our review:

1. Whether admission of testimony about Peters' post-arrest silence was fundamental error;

2. Whether the State presented sufficient evidence to convict Peters; and

3. Whether Peters' sentence is inappropriate based on the nature of the offense and his character.

We affirm.

### FACTS AND PROCEDURAL HISTORY

At approximately 11:30 p.m. on December 1, 2010, Indiana State Trooper Luke Waikel observed Peters driving on slick pavement at seventy-five miles per hour in a sixty miles-per-hour zone. Trooper Waikel attempted to pull Peters over, but Peters did not immediately comply. Rather, Trooper Waikel had to use his loudspeaker five times to advise Peters to pull to the side of the road, before Peters pulled to the side of the road. Trooper Waikel exited his patrol car, approached the passenger side of Peters' car, and no-

---

1. Ind.Code § 35–47–4–5.

ticed an open alcoholic beverage in the passenger seat. When Trooper Waikel knocked on Peters' passenger window, Peters sped off. Trooper Waikel returned to his car and pursued Peters at speeds exceeding ninety miles-per-hour.

Peters crashed his vehicle, and the pursuit continued on foot. Both Peters and Trooper Waikel scaled a short chain-link fence, from which Peters sustained a cut to one of his hands. While running, Peters kept his hands in his jacket pockets. Trooper Waikel lost sight of Peters when Peters went around a corner of Fellowship Baptist Church, an L-shaped building. Trooper Waikel noticed Peters' footprints in the snow around the corner of the church and saw him run between two houses on a nearby street.

Trooper Waikel followed Peters' footprints until he reached a dumpster behind a store, where the footprints stopped. By this time, Trooper Ryan McNamara and his police dog, Zane, were on the scene. Zane directed the troopers to Peters, who was crouched behind the dumpster. Peters was handcuffed and taken into custody. Warsaw Police Officer R.J. Nethaway searched Peters after his arrest and found four .9 mm bullets in his pocket. Officer Nethaway noticed the cut on Peters' hand and transported him to the hospital.

While Peters was being treated at the hospital, Trooper McNamara and Zane returned to the church and observed two sets of footprints—one set from tennis shoes, and the other from police boots. The tennis shoe tracks ran close to the building, and the marks in the snow indicated Peters fell near the corner of the building. Another officer noticed a "black dot" on the church roof, which turned out

to be a Glock .9 mm Model 26 semi-automatic handgun. (Tr. at 420.)

The State charged Peters with Class D felony resisting law enforcement,[2] Class A misdemeanor carrying a handgun without a license,[3] and Class C felony carrying a handgun by an individual with a prior felony.[4] The State amended the handgun charge to Class B felony unlawful possession of a firearm by a SVF. Peters requested and was granted a trifurcated trial. During the first part of Peters' trial, the jury found him guilty of Class D felony resisting law enforcement and Class A misdemeanor possession of a handgun without a license. In the second part of his trial, against advice of counsel, Peters pled guilty to Class C felony possession of a handgun without a license by a person previously convicted of a felony. In the final part of his trial, the jury found Peters guilty of Class B felony unlawful possession of a firearm by a SVF.

At sentencing, the trial court merged the Class A misdemeanor and Class C felony handgun findings into the SVF finding, but did not enter convictions for the Class C felony and Class A misdemeanor. It sentenced Peters to three years for Class D felony resisting law enforcement and ten years for Class B unlawful possession of a handgun by a SVF, to be served consecutively.

## DISCUSSION AND DECISION

1. *Use of Peters' Post–Arrest Silence at Trial*

Two of the officers involved in Peters' arrest testified regarding Peters' silence when he was asked questions after his arrest. During Trooper Waikel's testimony, the following exchange occurred:

**2.** Ind.Code § 35–44–3–3(a)(3).

**3.** Ind.Code § 35–47–2–23(c).

**4.** Ind.Code § 35–47–2–23(c)(2)(B).

[Prosecutor]: Okay what happened next?

[Waikel]: He is not talking to us. He won't say a word. I mean there was a cut to one of his hands and I'm trying to ask if he is okay. You know there is a minor crash so I want him to respond to me in some way shape or form. He is not responding to me, but I do smell the odor of the alcoholic beverage, which would coincide with the alcohol in the vehicle. And I also notice his eyes are bloodshot. And through my experience that would be a good case for operating while intoxicated. Since he is not responding to me and there's a possibility that there is an injury I made the call to transport him to the hospital. I requested R.J. Nethaway, a Warsaw Officer, to transport him to the hospital and I followed right behind.

[Prosecutor]: Do you remember when you are talking with the Defendant what questions you actually asked of him?

[Waikel]: Not specifically questions, no, but I just know that he refused to answer anything as far as medical. You know, I probably asked him why did you run and things of that nature, but not specifically.

[Prosecutor]: He didn't say anything?

[Waikel]: Not a word.

(Tr. at 264–65.) Waikel also mentioned Peters' silence when asked about any health conditions he may have:

Due to the possible cross-contamination, because I went hands on with him and handcuffed him when we found him, even though he was cooperative I have to touch his hands and there is possible blood contamination. So I just try to ask him, you know, do you have anything that I need to know about that might harm me as far as blood born [sic] pathogens or any diseases that I need to be concerned about. He wouldn't even answer that, wouldn't even give me the pleasure of answering back for my own safety.

(*Id.* at 265–66.) Waikel again referenced Peters' silence during re-examination by the prosecutor:

[Prosecutor]: When was it in the chase that you realized that the Defendant's hands were cut?

[Waikel]: ... The reason—You know he had a cut, but the reason I decided, since he wasn't talking to us, the reason I had to make the decision to go to the hospital was essentially because of the crash. He was traveling over 30 miles per hour and of course the ER doctor did do a CT scan. That is one of the questions they usually ask you; were you going over 30 miles an hour when you crashed, and I estimated him to be going over that. So the ER doctor asked that, did the CT scan, everything checked out okay, since he wasn't talking to the ER doctor much either.

(*Id.* at 394.) Waikel also mentioned Peters' silence during re-cross-examination, when Peters asked, "And so it is your testimony that you were worried that Mr. Peters was hurt because of this crash?" Waikel responded, "There is always a possibility and since he wasn't talking to us we have to decide." (*Id.* at 403.) Peters did not object during any of Officer Waikel's testimony regarding Peters' silence.

The first objection to testimony referencing Peters' silence occurred during Officer Nethaway's testimony:

[Nethaway]: And I took him back into the ER and they treated his hands and also Trooper Waikel read him the implied consent warning because he would not, when asked to take the Breathalyzer he wouldn't, actually he wasn't talking at all. And [sic] read him the implied consent—

[Prosecutor]: Not talking at all because of pain? Did he give any reason—

[Defense]: Objection.

(SIDEBAR INAUDIBLE)

[Judge]: Alright sustain the objection. Please rephrase the question.

[Prosecutor]: Yes.

DIRECT EXAMINATION CONTINUES BY PROSECUTOR DANIEL HAMPTON

[Prosecutor]: Officer as you are talking with him any observations of his physical appearance of why he is not answering you?

[Nethaway]: I didn't observe anything that would keep him from speaking. My take on it was that he didn't want to speak with me.

[Defense]: Objection Your Honor. May we approach?

[Judge]: Go ahead.

(SIDEBAR INAUDIBLE)

[Judge]: Alright. I will overrule the objection. The officer can answer the question.

(*Id.* at 335–36.) During cross-examination Peters' counsel asked Officer Nethaway about Peters' silence:

[Defense]: You testified that Mr. Peters wasn't speaking with you on that day, is that right? Jeremy wouldn't talk to you?

[Nethaway]: When I was at the vehicle he did not speak to me at all.

[Defense]: None. At the end of the day we really don't know why he wasn't talking to you, isn't that right?

[Nethaway]: That's correct.

(*Id.* at 339.) Peters contends the prosecutor's use of his post-arrest silence violates his Fifth Amendment right against self-incrimination.

▇▇▇ Peters did not object to Trooper Waikel's testimony. The failure to make a contemporaneous objection to the admission of evidence at trial results in waiver of the error on appeal. *Brown v. State,* 783 N.E.2d 1121, 1125 (Ind.2003). The record before us does not reveal on what grounds Peters objected to Officer Nethaway's testimony. Therefore we cannot determine whether, on appeal, Peters is arguing a different ground than he argued at the trial court, which would result in waiver.[5] *See White v. State,* 772 N.E.2d 408, 411 (Ind.2002) ("A party may not object on one ground at trial and raise a different ground on appeal.").

▇▇▇ Despite Peters' waiver, we may reverse if he is able to demonstrate fundamental error. *Wilson v. State,* 931 N.E.2d 914, 919 (Ind.Ct.App.2010), *trans. denied.* Fundamental error is "error so prejudicial to the rights of the defendant that a fair trial is rendered impossible." *Id.* The fundamental error rule is extremely narrow, and applies only when "the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id.* Mere prejudicial error will not satisfy the fundamental error rule—the defendant must "show greater prejudice than ordinary reversible error[.]" *Id.* (quoting *Purifoy v. State,* 821 N.E.2d 409, 412 (Ind.Ct. App.2005), *trans. denied*).

The Fifth Amendment to the United States Constitution [6] provides that no person "shall be compelled in any criminal

---

5. Indiana Appellate Rule 31 allows an appellant to offer a verified statement of the evidence when a portion of the transcript is unavailable. Peters did not do so.

6. The Fourteenth Amendment to the United States Constitution extends this provision to the states.

case to be a witness against himself." To protect that right, police officers are required to advise citizens on arrest that they have a right to remain silent and that silence cannot be used against them at trial. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To determine if the use of Peters' silence violated the Fifth Amendment, we must consider the circumstances under which he was silent and how his silence was used at trial.

■ Peters characterizes his silence as "post-arrest, but pre-*Miranda*" silence, and the State does not dispute this characterization. A defendant's post-arrest, post-*Miranda* silence may not be used to impeach a defendant, *Doyle v. Ohio,* 426 U.S. 610, 617, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), but a defendant's post-arrest, pre-*Miranda* silence may be used for impeachment purposes. *Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). The United States Supreme Court has also held a defendant's post-arrest, post-*Miranda* silence could not be used substantively in the prosecution's case-in-chief. *See Wainwright v. Greenfield,* 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). Whether a defendant's post-arrest, pre-*Miranda* silence may be used substantively has yet to be addressed by the United States Supreme Court, but Indiana courts have held post-arrest, pre-*Miranda* silence cannot be used as substantive evidence in the State's case-in-chief. *See Rowe v. State,* 717 N.E.2d 1262, 1267 (Ind.Ct.App.1999) (defendant's pre-*Miranda* silence could not be used in State's case-in-chief); *see also Akard v. State,* 924 N.E.2d 202, 209 (Ind.Ct.App. 2010), (defendant's post-arrest, pre-*Miranda* silence could not be used as part of the State's case-in-chief), *aff'd in part and reversed in part on other grounds,* 937 N.E.2d 811 (Ind.2010).

Peters bases his argument on *Akard,* in which our Indiana Supreme Court affirmed our holding that the use of Akard's post-arrest, pre-*Miranda* silence violated his Fifth Amendment right. In *Akard,* we held the brevity of the references in comparison to the other substantial evidence presented to prove Akard's guilt rendered any error harmless. *Akard,* 924 N.E.2d at 209.

■ Our Indiana Supreme Court in *Bieghler v. State,* 481 N.E.2d 78, 92 (Ind. 1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349, provided a test to determine if the use of a defendant's post-arrest, post-*Miranda* silence was harmless. It instructed us to consider:

1. The use to which the prosecution puts the post-arrest silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference. [and]

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.

*Id.* In *Rowe,* we adopted this test for cases in which the State referred during its case-in-chief to defendant's pre-*Miranda* silence. 717 N.E.2d at 1267. Accordingly, we apply the test to the facts in the instant case.

a. *Use*

Testimony regarding Peters' silence was elicited during questioning about events that occurred between the time Peters was apprehended and the time he was discharged from the hospital. Trooper Waikel and Officer Nethaway testified Peters was silent when asked if he was injured and if he would submit to a Breathalyzer test. However, both Trooper Waikel and

Officer Nethaway also referred more generally to Peters' silence generally: "He is not talking to us. He won't say a word[,]" (Tr. at 264), and "My take on it was that he didn't want to speak to me." (*Id.* at 335.) The State argues it used the testimony regarding Peters' silence to explain why he was taken to the hospital, not to indicate he was uncooperative or to imply guilt.

### b. *Who Elected to Pursue Questioning*

The majority of Trooper Waikel's and Officer Nethaway's statements regarding Peters' silence came in response to the State's questions regarding the reason they took Peters to the hospital. However, some of the statements were in response to Peters' cross-examination questions.

### c. *Quantum of Other Evidence of Guilt*

The other evidence of Peters' guilt, while not as overwhelming as that in *Akard*, was strong. With regard to the resisting law enforcement charge, the State presented evidence Peters left the scene of a traffic stop, police chased him, and Peters crashed his car. Trooper Waikel and Trooper McNamara testified regarding the foot pursuit that followed, and the State presented photographic evidence of certain parts of that chase, including the area where the gun was found.

To support the charge of possession of a handgun without a license, the State presented evidence the gun they recovered had been stolen from a person who lived at the address listed on Peters' drivers license; at the time of arrest Peters possessed ammunition for the gun they found; Peters ran with his hands in his pockets until he rounded the corner of the church where the gun was found; Peters' footprints were found near where the gun was found on the church roof; and, based on Trooper McNamara's testimony, it appeared Peters had fallen in the place below where the gun was found on the roof, which would permit an inference that he fell while throwing the gun onto the roof.

To support the possession of a handgun by a SVF charge, the State presented evidence Peters had been convicted in Illinois of dealing in a controlled substance, which crime qualifies Peters as an SVF pursuant to Ind.Code § 35–47–4–5(b). Peters pled guilty to possession of a handgun without a license by an individual with a prior felony.

### d. *Intensity and Frequency of the Reference*

Peters' silence was mentioned six times during his trial—four times by the prosecution and twice by the defense. The prosecution did not mention his silence during opening or closing arguments. Peters objected twice to the testimony regarding his silence, but only during Officer Nethaway's testimony; Peters did not object during Trooper Waikel's testimony. The testimony elicited by the prosecution mentioned Peters' silence as part of an ongoing narrative regarding the events that occurred, and the references were not repetitive in nature. For example, Trooper Waikel first testified regarding Peters' silence during his first direct examination, and then testified regarding it on re-direct-examination some time later.

### e. *Opportunity to Give Curative Instructions*

Peters did not ask for a mistrial, and thus we focus on the judge's opportunity to give curative instructions to the jury. The record does not reflect what the judge said in court to counsel within earshot of the jury, or to the jury itself because the transcript indicates that dialogue was "inaudible," (*id.* at 335), and Peters did not provide a statement of the evidence pursuant to App. R. 31. The record does reflect that the judge first sustained Peters' ob-

jection to Officer Nethaway's testimony regarding Peters' silence, but then, after the State rephrased the question, overruled another objection.

Considering all of the *Bieghler* factors, any error in allowing the testimony regarding Peters' silence was harmless because the evidence of Peters' guilt was strong, the references were brief and part of a narrative unrelated to the elements of the crime, and the prosecution did not emphasize Peters' silence in opening and closing arguments. We are unable to determine what action the judge took in response to Peters' objections and, therefore, cannot determine if he admonished the jury or attempted to address the State's use of Peters' silence. We decline to hold any error was fundamental. *See, e.g., Akard*, 924 N.E.2d at 209 (based on the brevity of references to Akard's silence in comparison to other evidence, their admission did not amount to fundamental error).

2. *Sufficiency of the Evidence*

■■■ When reviewing sufficiency of evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the decision. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the jury's role, and not ours, to assess witness credibility and weigh evidence to determine whether it is sufficient to support a conviction. *Id.* To preserve this structure, when we are confronted with conflicting evidence, we consider it most favorably to jury's decision. *Id.* We affirm a conviction unless no reasonable jury could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is

sufficient if an inference reasonably may be drawn from it to support jury's decision. *Id.* at 147.

To convict Peters of Class B felony unlawful possession of a handgun by a serious violent felon, the State had to prove that he was a SVF,[7] as defined by Ind. Code § 35–47–4–5(b), and that he "knowingly or intentionally possess[ed] a firearm." Ind.Code § 35–47–4–5(c). Peters does not dispute his SVF status; he admitted he was convicted in Illinois of dealing in a controlled substance, which renders him an SVF pursuant to Ind.Code § 35–47–4–5(b). However, he claims, "there were no fingerprints or DNA found on the gun, demonstrating a lack of direct evidence in this case that can tie the gun to [Peters]." (Br. of Appellant at 16.)

■■■ A conviction may rest on circumstantial evidence alone. *Hayes v. State*, 876 N.E.2d 373, 375 (Ind.Ct.App.2007), *trans. denied.* Circumstantial evidence need not overcome every reasonable hypothesis of innocence. *Id.* It is sufficient if an inference drawn from the circumstantial evidence reasonably tends to support the conviction. *Id.*

■■■ The State presented evidence Peters ran with his hands in his pockets during the foot pursuit with Trooper Waikel; a gun was later found on the roof of a church, in an area where Trooper Waikel could not see Peters during the foot pursuit and where the markings in the snow suggested Peters had fallen down; Peters had .9mm bullets in his pocket when he was arrested; the gun was a .9mm Glock; the gun had been reported stolen by a person who lived in Columbus, Ohio, and Peters lived in Columbus, Ohio. The jury reasonably could have inferred Peters had

---

7. Peters does not argue the State failed to prove he committed Class D felony resisting

law enforcement.

possessed the gun found on the roof of the church. *See Tate v. State,*835 N.E.2d 499, 510 (Ind.Ct.App.2005) (conviction of Class B felony unlawful possession of a firearm supported by circumstantial evidence), *trans. denied.* Thus, the State presented sufficient evidence Peters committed Class B felony unlawful possession of a firearm by a SVF.

### 3. *Appropriateness of Sentence*

We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. *Williams v. State,* 891 N.E.2d 621, 633 (Ind.Ct.App.2008) (citing Ind. Appellate Rule 7(B)). We consider not only the aggravators and mitigators found by the trial court, but also any other factors appearing in the record. *Roney v. State,* 872 N.E.2d 192, 206 (Ind.Ct.App.2007), *trans. denied.* The appellant bears the burden of demonstrating his sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006).

When considering the nature of the offense, the advisory sentence is the starting point to determine the appropriateness of a sentence. *Anglemyer v. State,* 868 N.E.2d 482, 494 (Ind.2007), *clarified on reh'g* 878 N.E.2d 218 (Ind.2007). When a court deviates from the advisory sentence, we consider whether there is anything more or less egregious about the offense that makes it different from the "typical" offense accounted for by the legislature when it set the advisory sentence. *Rich v. State,* 890 N.E.2d 44, 54 (Ind.Ct. App.2008), *trans. denied.*

The advisory sentence for a Class B felony is ten years, with a range of six to twenty years. Ind.Code § 35–50–2–5. The advisory sentence for a Class D felony is one and one-half years, with a range of six months to three years. Ind.Code § 35–50–2–7. Peters received the advisory sentence for Class B felony unlawful possession of a firearm by a serious violent felon, and the maximum sentence of three years for Class D felony resisting law enforcement. His sentences were to be served consecutively, for a combined sentence of thirteen years.

Peters argues his sentence for the Class B felony firearms charge was inappropriate because the "basic nature of the offense that [he] would have committed in this case was a Class A misdemeanor." (Br. of Appellant at 27.) However, the crime of Class A misdemeanor possession of a handgun without a license is distinct from Class B felony unlawful possession of a firearm by a SVF. *Compare* Ind.Code § 35–47–2–23(c) *with* Ind.Code § 35–47–4– 5. The legislature made the distinction "to keep firearms out of the hands of those persons whose prior conduct indicated a heightened proclivity for using firearms to threaten community peace." *Baker v. State,* 747 N.E.2d 633, 638 (Ind.Ct.App. 2001), *reh'g denied.*

Further, the legislature deemed dealing in a controlled substance, Peters' underlying conviction creating his status as a SVF, to be more serious than that of a lower level felony drug conviction. *Compare* Ind.Code § 35–47–2–23 (elevating Class A misdemeanor possession of a handgun without a license to a Class C felony if the person has any previous felony conviction) *with* Ind.Code § 35–47–4–5 (making it a Class B felony for a person to possess a firearm when the person has committed one of twenty-seven listed violent crimes, which list includes drug dealing but not mere possession of a drug). In addition, Peters attempted to hide the gun on the roof of a church. While the details of Peters' crime are not necessarily noteworthy, we do not agree they warrant a sentence shorter than the advisory.

With regard to Peters' character, one relevant factor is criminal history.

See *Rutherford v. State,* 866 N.E.2d 867, 874 (Ind.Ct.App.2007). While we do not consider a history of arrest to be evidence of criminal history, "a record of arrest, particularly a lengthy one, may reveal that a defendant has not been deterred even after having been subject to the police authority of the State." *Cotto v. State,* 829 N.E.2d 520, 526 (Ind.2005). Peters' criminal history and arrest record are both substantial. He has been convicted of misdemeanor possession of a stolen vehicle, felony dealing in a controlled substance, and identity theft in Illinois. At just twenty-three years old, Peters had been arrested over ten times as an adult. While the charges that are the subject of the instant action were pending, Peters had two active warrants for his arrest in Ohio—one for misdemeanor domestic battery, and one for three felony counts. Despite his guilty plea to one of the charges, and his claim that he has changed since the birth of his child, we cannot say his character renders his thirteen-year sentence inappropriate.

## CONCLUSION

The use of Peters' post-arrest, pre-*Miranda* silence during the State's case-in-chief was not fundamental error because the evidence of his guilt was strong, the references to his silence were brief, and the references came amidst the narrative explaining the events after the crime. Additionally, the State presented sufficient evidence Peters committed Class B felony unlawful possession of a firearm by a serious violent felon, and his sentence was not inappropriate. Accordingly, we affirm Peters' convictions and sentences.

Affirmed.

NAJAM, J., and RILEY, J., concur.